## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:08-CT-3138-BO

| | |
|---|---|
| SHAWN A. WILLIAMS,<br>Plaintiff, | )<br>)<br>) |
| v. | )    O R D E R<br>) |
| JOHN HAIGWOOD, et al.,<br>Defendants. | )<br>) |

Plaintiff, Shawn A. Williams, was an inmate in the custody of the North Carolina Department of Correction ("DOC"), now the Division of Adult Correction, at the time he filed his complaint. See N.C.G.S. §§ 143B-600(a)(1); -700 et seq. Now before the court are two motions filed by defendants: a motion for summary judgment [D.E. 56] and a motion to strike the plaintiff's expert [D.E. 64]. Plaintiff (through counsel) has responded to the motions, and on February 6, 2013, a summary judgment hearing was held. In this posture, the matter is ripe for determination.

### Background

Shawn Williams filed the complaint on October 27, 2008, on pro se civil rights forms pursuant to 42 U.S.C. § 1983 [D.E. 1]. On April 9, 2009, the court allowed the matter to proceed, and entered an order of investigation [D.E. 5-6]. Thereafter, on June 15, 2009, North Carolina Prisoner Legal Services ("NCPLS") accepted the case [D.E. 13]. On July 14, 2009, NCPLS attorney Elizabeth Albiston entered a notice of appearance on Williams' behalf [D.E. 15] and the parties filed a joint motion for extension of time [D.E. 16]. The joint memorandum for the extension stated that NCPLS anticipated filing the amended complaint would be filed "on or

before August 31, 2009" and then allowed for the answer to be filed thereafter. Id. The court allowed the extension [D.E. 17]. The amended complaint was filed on May 31, 2011 [D.E. 18]. Two defendants were named in the amended complaint, Bertie Correctional Institution psychologist Joe Sturz and Bertie Superintendent Anthony Hathaway. The other originally named defendants, John Haigwood, William R. Faveret, and John T. Bullock were voluntarily dismissed [D.E. 19]. On August 10, 2011, defendants filed a motion to dismiss with several medical records attached [D.E. 24]. On November 15, 2011, the court construed the motion as one for summary judgment due to these attachments, denied it without prejudice given no discovery had been undertaken, and set discovery to be completed by February 15, 2012 [D.E. 31]. On April 23-24, 2012, defendants filed a motion for partial judgment on the pleadings and a motion to stay discovery [D.E. 48-50]. On September 27, 2012, the court denied the motions [D.E. 55]. On December 3, 2012, defendants filed a motion for summary judgment [D.E. 56]. On January 21, 2013, defendants also filed a motion to strike plaintiff's expert [D.E. 64]. Plaintiff filed responses opposing both motions [D.E. 58 and 74]. On February 6, 2012, a summary judgment hearing was held. Thereafter on February 14, 2013, defendants filed a supplemental memorandum in support of their motion for summary judgment [D.E. 73].

Discussion

i. Motion to Strike

Defendants seek to bar the testimony of plaintiff's proposed expert witness, Ginger C. Calloway, Ph.D., through a motion to strike [D.E. 64]. For the reasons asserted in plaintiff's opposition to the motion to strike, the motion is denied. See e.g., Fed. R. Evid. 702; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150-151 (1999); Daubert v. Merrell Dow Prarm., Inc.,

2

509 U.S. 579, 591 (1993); United States v. Forrest, 429 F.3d 73, 80 (4th Cir. 2005); Westberry v.

Gislaved Gummi AB, 178 F.3d 257, 260 (4th Cir. 1999); United States v. Gastiaburo, 16 F.3d

582, 589 (4th Cir. 1994); and Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993).

ii.    Facts

Plaintiff has a history of psychiatric problems that began in his childhood and
have continued into his adult life, including depression, mania, anxiety,
hyperactivity, impulsivity, substance abuse, and suicidal ideation. Plaintiff
has a tattoo on his left wrist consisting of a dotted line along his vein and the
words "cut here."

Before he entered DOC custody, Plaintiff received psychiatric and
psychological treatment for his mental state for at least ten years, including
receiving psychotropic medications. Plaintiff is low-income and tended to
only access mental health services in emergency situations.

In May 1996, at the age of fifteen, Plaintiff was court-ordered to be
hospitalized at UNC Hospital for evaluation and medication following being
charged with several criminal offenses. Mental health staff at UNC noted that
Plaintiff was exhibiting significant manic and aggressive behavior, and
transferred him to John Umstead Hospital, where he stayed for five months.
The psychologist at John Umstead noted Plaintiff's recent diagnoses of
Bipolar Disorder, Oppositional Defiance Disorder, and Attention Deficient
Hyperactivity Disorder. Additionally, Plaintiff was diagnosed at John
Umstead Hospital with Conduct Disorder and Attention Deficient Disorder.
Plaintiff was successfully treated with psychotropic medications, including
Depakote, Risperidone, and Dexedrine.

For the years following this hospitalization, Plaintiff was treated at
Alamance-Caswell Area Mental Health, where he was prescribed Depakote,
Risperidone, and Lithium.

In July 2004, Plaintiff was treated at Alamance Regional Medical Center
Emergency Room for Bipolar Disorder and was prescribed Lithium.

Plaintiff has found Lithium to be extremely effective at helping him manage
his psychiatric disturbances, including depressive and manic symptoms.

9/27/12 Order at 3-4 (citing Am. Compl. , 3-6).

In October 2005, plaintiff was admitted to DOC custody. Summ. J. Mem., Ex A1,

"Inmate Summary Record." Plaintiff was housed at Piedmont Correctional Institution. Id. On

November 17, 2005, Karen Smith, Psychology Intern, evaluated plaintiff under the supervision of

John Haigwood, Mental Health Services Coordinator. Id., Ex A2, "11/16/05 Haigwood Report."

Plaintiff was referred for a mental health assessment "due to a history of inpatient and outpatient

mental health treatment." Id. at 1 of 3. This report stated that "Mr. Williams did not appear to be

at above-average risk for violence, self-injury or escape at this time." Id. The "current problem"

was described as "Mr. Williams reported that his 'mind races all the time' and that his mood has

been 'a little down' lately, since he has not received a visit from his family for the past month."

Id. Plaintiff stated that he was "Bipolar" and needs "to get [his] Lithium" or some "medication

for his nerves." Id. A detailed mental history was included in the report. Id. The report

included a substance abuse history of "daily use of cocaine, marijuana, and alcohol 'since his

teens,' as well as "snorting coke" with his mother at the age of 11. Id. at 2 of 3. The report also

included social history, and educational and employment history. Id. Haigwood's assessment

was that plaintiff's "previous symptoms did not appear to meet criteria for Bipolar Disorder, but,

instead, were likely related to substance dependence and personality factors." Id. The report

further held that plaintiff's current symptoms indicate "a Deferred Diagnosis on Axis 1,

Polysubstance Dependence, and Antisocial Personality Disorder." Id. Lastly, the symptoms

were to be monitored and prior medical records requested to further evaluate the need for

treatment. Id. He was not placed on the psychology caseload unless requested. Id. at 3 of 3.

4

On December 1, 2005, the DOC transferred plaintiff to Brown Correctional Institution.

Summ. J. Mem., Ex. A1 at 2. On December 27, 2005, the DOC transferred plaintiff to Wayne

Correctional Institution. Id.

> On March 27, 2006, Plaintiff was transferred to Hoke Correctional Institution.
> During the following six months, Plaintiff made three mental health referral
> requests to speak with mental health staff, but the mental health staff did not
> order an initial mental health evaluation for Plaintiff and did not refer him to a
> mental health counselor.
>
> On September 21, 2006, after being at Hoke Correctional Institution for nearly
> six months with no mental health assessment or treatment, Plaintiff attempted
> suicide by slicing his left wrist with a razor blade. He received six stitches in his
> wrist at Hoke County Medical Center.

[9/27/12 Order at 4 (citing Am. Compl., 3-6). After his suicide attempt, plaintiff was transferred

to Central Prison for a psychiatric assessment and was placed on suicide watch. Summ. J. Mem.,

Ex A1. While on suicide watch, plaintiff asserts he was left naked in a freezing cold cell with

cockroaches in it for days. Resp. to Defts' Mot. for Summ. J., Pl. Aff. at 18. On the following

day, Beth Ridgway, M.D., a DOC psychiatrist, evaluated plaintiff. Summ. J. Mem., Ex. A3. Dr.

Ridgway noted that plaintiff had no history of "violence, escape, or suicidality." Id. at 1 of 3.

And, noted that plaintiff stated "he knew [cutting himself] would not hurt him" and "I'm not

ready to die." Id. The notes reference his distress over not hearing from family and his request

to talk with someone in Mental Health with no response. Id. He stated "[h]e cut his wrist in

hopes of being able [to] talk to someone." Id. Further, the notes state plaintiff "denied suicidal

or homicidal ideations, plan or intent. There was no history of prior suicide attempts. The

patient denied an intent to die and admitted that he had set up the cutting so the officers would

find him on rounds." Id. Plaintiff asserts that he stated these things to get out of the adverse

condition of suicide watch and to get his clothing back. Pl. Aff. at 18.

5

Dr. Ridgway noted in the report that plaintiff had taken lithium in the past for bipolar disorder but cautioned "the history for this is vague and what is clear is that the patient had never been sober long enough to correctly diagnose him with a primary affective disorder." Id. Dr. Ridgway noted "polysubstance dependence, alcohol, crack cocaine and marijuana for past 11 to 12 years . . . . This incarceration has been his longest period of sobriety." Id. at 1-2 of 3. Dr. Ridgway observed Plaintiff exhibited "[l]ogical thought processes" . . . "denied suicidal or homicidal ideation" . . . [d]enied feeling depressed" . . . "[a]verage intelligence" . . . "[g]ood insight" . . . "[p]oor judgement." Id. at 2 of 3. Dr. Ridgway concluded that plaintiff:

> engaged in self-destructive behavior by cutting his left wrist on 09/21/06 for attention seeking behavior . . . . Despite his previous history of a diagnosis of Bipolar Disorder, he had not been sober for a long enough period of time to rule out a substance induced mood syndrome. Now, he has some distress over social issues but does not have overt depression or any signs or symptoms of any Axis I disorder that would indicate a need for medication. Therefore, we are not able to support his history of BiPolar disorder due to long-standing polysubstance dependence.

Id, at 2 of 3. Dr. Ridgway diagnosed an Axis I Polysubstance Dependence, an Axis II anti-social personality disorder and an Axis III self-inflicted laceration. Dr. Ridgway prescribed no psychotropic medication, but "followup with Outpatient Mental Health for psychotherapy for social stressors." Id. at 2-3 of 3.

On September 25, 2006, the DOC transferred plaintiff back to Hoke. Summ. J. Mem., Ex. A1. On October 2 and 9, 2006, plaintiff met with Hoke Staff Psychologist William Faveret. Id., ExA4. On both occasions, Faveret noted plaintiff was adjusting satisfactorily and that there was no change in diagnosis. Id.

On October 18, 2006, the DOC transferred plaintiff to Pasquotank Correctional Institution ("PCI"). Summ. J. Mem., Ex. A1. On November 1, 2006, plaintiff met with Dr.

6

Robert Lamielle, PCI's Psychological Program Director, on a staff referral for the recent self-injury issue. Id., Ex. A5 "11/1/06 Lamielle-Mental Health Services Referral." Plaintiff reported that he was a heavy user of cocaine, marijuana and alcohol. Id. Plaintiff stated that he was discouraged in segregation and upset that he had not seen his family, but reported he would not hurt himself now because he was a young man with a lot ahead of him. Id. Plaintiff indicated his self-harm would not be fair to his children. Id.

On November 27, 2006, plaintiff met with Lamielle for a second time. Id., Ex. A6. Plaintiff stated he wanted psychotropic medications. Id. Lamielle found, and informed plaintiff, that his situation did not warrant a referral for psychotropic medication. Id. Plaintiff stated he was going to submit a grievance. Id. Lamielle also stated that "[t]here is no mental illness." Id.

On December 20, 2006, plaintiff was transferred to Bertie Correctional Institution ("Bertie"). Summ. J. Mem. Ex A1. Plaintiff's history of Bipolar Disorder was noted on his transfer form at Bertie, and his recent suicide attempt was noted in his initial health screening. 9/27/12 Order 9/27/12 at 4 (citing Am. Compl., 3-6). At all times relevant herein, Bertie was a Mental Health 1 ("MH1") facility. Summ. J. Mem., Ex. A "Aff. Sturz, " ¶ 26. An MH1 facility has no resident psychiatrist, and no psychotropic medication is dispensed. Id. Pursuant to DOC (now Department of Public Safety) policy, psychologists maintain no caseload, and inmates received mental health counseling either on self-referral or by a staff member's referral. Id. Furthermore, no Axis I diagnosis are to be housed in MH1 facilities. Id.[1]

---

[1] After plaintiff was transferred from Bertie, the facility was converted into an MH2 facility meaning it has "regular mental health caseload, and as a consequence, it can house Axis 1 inmates." Struz Aff. ¶ 28.

7

Defendant Sturz met plaintiff for the first time after plaintiff requested a mental health referral on March 19, 2007. Id. ¶ 45, and Defts.' Ex. A7, (Sturz treatment notes). Plaintiff requested psychotropic medication for his changing moods, and the notes indicate plaintiff was disappointed that psychotropic medication was not available at Bertie. Id., Ex. A7 at 2. Sturz also noted he discussed coping mechanisms, and counseled plaintiff on understanding his drug addictions and drug dependence. Id., Ex. A7 at 2. It is further noted on plaintiff's medical chart that plaintiff was on intensive control on this date, was alert and oriented, exhibited slight signs of depression, but no overt signs of mania or psychosis, and denied suicidal or homicidal ideations. Id., Ex. A8 ("Plaintiff's Medical Chart" 3/19/07).

On April 19, 2007, at 3:10 p.m., plaintiff told correctional staff he intended to kill himself. Id., Ex. A8 ("Plaintiff's Medical Chart" 4/18/07). Plaintiff was immediately placed on Level I suicide precautions. Id., Ex. A8 at 4. Plaintiff was placed in administrative segregation; he was observed continuously; his clothing and other articles with which he could harm himself were taken away; he was given a safety blanket and safety smock; he was given finger food and no utensils. Id.

Defendant Sturz met with plaintiff the following day. Id., Ex. A7 at 3. Sturz noted that plaintiff was irritable and angry with the segregation officers. Id. Plaintiff denied he had any intention of harming himself. Id. Sturz ordered that he be removed from Level I suicide precautions at 11:15 a.m., and be placed on Level II suicide precautions. Id. Over the next two days, Sturz monitored plaintiff's progress by telephone. Id. at 4- 5. On April 23, 2007, Sturz met with plaintiff who again indicated his threats of self-harm were motivated by his anger with the segregation officer. Id. at 6. Plaintiff's mood was noted as improved and appearing to have

8

more self control. Id. Sturz ordered that he be removed from the Level II suicide precautions and be returned to the segregation unit. Id.

Sturz met with plaintiff on May 11 and 29, 2007. Id. at 7, 8. During these meetings, it is noted that plaintiff expressed his concern that his family had not written to him, and his continuing frustrations with custody staff. Id. Sturz noted plaintiff's mood as cooperative, anxious, and tense; however, defendant Sturz found he did not appear to be at an increased risk for self-harm. Id. Defendant Sturz also found that plaintiff did not exhibit signs of a mental disorder that would require mental health services at that time. Id.

On the morning of June 8, 2007, plaintiff was involved in an altercation with officers where use of force was employed, including pepper spray. Id. Ex. A8 at 8. Plaintiff is a practicing Native American and he asserts that during this event, the correctional officers desecrated his Native American sacred items box. Resp. to Defs' Mot. for Summ J., Pl. Dep. at 72, 81. Plaintiff asserts that this act, compounded with his daily depression and lack of family contact, was the catalyst for his suicide attempt later in the day by cutting his left wrist with a razor. Am. Compl. ¶ 28; Summ. J. Mem, Ex. A7 at 9; Pl. Dep. at 72, 81. The cut required stitches and/or steri strips. Id.; Summ. J. Mem., Ex. A8 at 9. Defendants dispute the characterization as a suicide attempt and label it "feigned self-harm." Summ. J. Mem. at 11; Ex. A8 at 8. Plaintiff told the nurse who treated his injuries that day that "he cut himself because the officer assaulted him." Id. Ex A8 at 8.

After the incident, plaintiff was placed on Level I suicide precautions, was monitoring by nursing, custody and other mental health staff. Id. At the time plaintiff engaged in self-harm, Sturz was out of the state and did not see plaintiff until June 13, 2007. Summ. J. Mem., Aff.

9

Sturz at ¶ 53, Ex. A7 at 9. On June 13th, Sturz meet with plaintiff. Id., Ex. A7 at 9. At that time, Sturz noted that plaintiff stated the incident was motivated by a desire that a superior officer come. Id., Ex. A7 at 9. Plaintiff denied thoughts of self-harm. Id. Sturz ordered that he be removed from the Level I suicide precautions. Id.

On June 14, 2007, Sturz again saw plaintiff. Id. Ex. A7 at 10. Plaintiff again asserted that he cut himself to draw the attention of the sergeant and not to harm himself. Id. Srurz noted plaintiff's mood had improved; Sutrz ordered that he be removed from the Level II suicide precautions and that plaintiff be returned to the segregation unit. Id., Ex. A7 at 10.

The following day, on June 15, 2007, Sturz saw plaintiff. Id., Ex. A7 at 11. Plaintiff was noted to be calm and cooperative. Id. Sturz states that he did not refer plaintiff to Central Prison Mental Health for evaluation for several reasons. First, because plaintiff would have returned to the unit in which he had previously been placed. Sturz Aff. at ¶ 56. Second, Sturz was following Dr. Ridgway's recommendation of September 25, 2006, and follow up with Outpatient Mental health for psychotherapy for social stressors. Id. And lastly, because Struz did not want to "encourage repetition of Plaintiff['s] counter-productive and manipulative self-harm behavior." Id.

Sturz saw plaintiff again on ten occasions between June 27 and October 15, 2007 . Id. ¶ 32 and 57, Ex. A7 at 12-22. Sturz also saw plaintiff February 8 and 26 and April 2, 2008. Id., Ex. A7 at 23-25. Plaintiff continued to express concerns over his family and his continuing frustration with custody staff. Id., Ex. A7 at 12-25. His mood and affect varied from meeting to meeting. Id. He stated that his mind was racing at several points. Id. Plaintiff expressed his desire for psychotropic medications and recited his treatment history outside of the DOC as an

10

indication of his need for psychotropic medication. Id., Ex. A7 at 12-25. Sturz continued to note no signs of an Axis I mental illness which would warrant medication. Id.

Plaintiff contends that throughout his counseling with Sturz, Sturz told plaintiff that his problems resulted from a lack of a certain religious belief. Plaintiff claims to be a Native American and told Sturz that he already had a spiritual practice. Id. Plaintiff claims Sturz continued to tell plaintiff that he needed a certain religious belief. Sturz also told plaintiff that it is the job of DOC psychologists to get and keep inmates off of psychological medications because the state is having budgetary problems. Id.

Defendant Sturz was first employed by the DOC on January 8, 2007, as the Coordinator of Psychological Services at Bertie Correctional. Resp. to Defts' Mot. for Summ. J., Sturz Affidavit, ¶ 6. Prior to that date, his sole experience as a psychologist was operating a marital counseling business out of his home. Summ. J. Mem., Ex. A, Sturz Dep. at 8-9. He did not diagnose or treat mentally ill patients, but rather provided relationship counseling. Id. at 11. Sturz has never read any literature about patients who have both Axis I disorders and substance abuse disorders, also known as a "dual diagnosis." Id. at 60.

Sturz states that he used a treatment modality called "Reality Therapy" in his sessions and treatment of plaintiff. Resp. to Defs' Mot. for Summ. J., Sturz Dep. at 15. According to defendant Sturz, he learned of this treatment through reading a book on the topic and that this strategy deals with individuals on the "character level" and "trying to get them to take responsibility for their actions, and facing them with the real world and how important it is to accept responsibility." Id. Instead of focusing on changing the circumstances, the method stresses the importance of choosing how to respond. Id.

11

Reality Therapy is not a conventional treatment for patients with Axis I disorders. Resp. To Defs' Mot. for Summ. J., Ex. B1, Calloway Report at 4. Reality Therapy is not commonly used as a sole form of treatment for incarcerated patients. Id. Furthermore, Dr. Calloway testified that in her opinion from December 2006 to April 2008, the psychological care rendered to plaintiff was not "in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time the health care was rendered." Am. Compl. Ex. G, Aff. Of Dr. Ginger Calloway, Ph.D., ¶ 4.

Likewise, it is clear that plaintiff filed multiple grievances requesting psychiatric treatment and medication throughout his incarceration at Bertie. Am. Compl., Ex A-F. In one grievance on June 4, 2007, plaintiff requested psychiatric treatment and medication to treat his bipolar disorder and described his symptoms as including mania, depression, racing thoughts, swinging sleeping and eating habits, and behavioral infractions. Id. at Ex. A. Plaintiff also listed institutions where he previously received psychiatric care and medications, including John Umstead Hospital, U.N.C. Hospital, Alamance Regional Medical Center, and Alamance County Jail. Id. In another grievance written on July 7, 2007, plaintiff requested psychiatric treatment and medication. Id. at Ex. C. Plaintiff wrote that he suffered daily and urged that someone contact John Umstead Hospital to review his medical history. Id. On August 3, 2007, plaintiff requested treatment for his disease, writing that he has "severe depression, anxieties, variations in sleep, mood highs, and times where I seem to just crash. ... I still strain from day to day with racing thoughts – temper – and seeming inability to control myself from getting into trouble." Id. At Ex. E.

12

The responses to the grievance were based on statements from Sturz informing him that psychotropic medications were not available at Bertie, and Sturz's opinion that plaintiff needed to "learn self control and make more mature choices to really deal with [his] problems." Id., Ex. B, 6/20/2007 grievance. On August 9, 2007, Sturz wrote in response to plaintiff's grievance that if plaintiff would "make better choices, his misery would begin to subside. He continues to have character problems and not mental health issues." Id., Ex. F.

Turning to facts regarding defendant Hathaway, defendant Hathaway was employed as Superintendent of Bertie and was responsible for creating and enforcing policies and procedures. Am. Comp., D.E. 18. ¶¶ 33-34; Summ. J. Mem, Ex. C, Hathaway Dep. at 8. Hathaway employed Larry Teele, Assistant Superintendent for Programs, to directly supervise Sturz. Hathaway Aff. ¶ 8. Hathaway gave Teele discretion to respond to prisoner complaints. Ex. C, Hathaway Dep. at 19.

As stated above, plaintiff submitted numerous grievances about inadequate mental health treatment. Am. Comp., D.E. 18., ¶¶ 27, 29-30. Hathaway never reviewed plaintiff's grievances, because Teele respond to them. Summ. J. Mem., Ex. C, Hathaway Aff., D.E. 57-20 ¶¶ 7-8. DOC's Administrative Remedy Procedure, Step 2 grievances "shall be submitted to the Facility Head or his designee for response." Id., Ex. C1, DPS Admin. Remedy Pro. at 6.

The first time Hathaway learned that plaintiff cut his wrist on June 8, 2007 was when this lawsuit was filed. Resp. Summ. J., Ex C. Hathaway Dep. at 12. Hathaway also gave Teele discretion to conduct Sturz's performance reviews. Id. at 10. Hathaway was aware that there was no system set up to inform him if a prisoner injured himself. Id. at 13. Hathaway never reviewed any internal records regarding prisoner self-injuries. Id. at 23. Hathaway believes

13

Bertie had a policy in place during the time Sturz was treating plaintiff that required him (or his designee) to conduct a review of self-injury attempts at Bertie. Id. However, Hathaway did not conduct such a review and does not know whether he designated someone else to do it. Id. at 24. Hathaway also believes that a policy was in place during the time that Sturz was treating plaintiff that required internal audits of Mental Health Services at Bertie. Id. at 17. However, Hathaway did not order any internal audits during that time period. Id. at 17-18.

The court concludes the factual finding by again reciting the earlier court order:

During March 2008, Plaintiff's sister, Jennifer Phillips, contacted Disability Rights North Carolina ("DRNC") and informed them that Plaintiff was not getting adequate treatment for his mental illness. DRNC is a non-profit Protection and Advocacy system that advocates for people with mental and physical disabilities. DRNC contacted prison officials at Bertie and advocated for Plaintiff to be transferred to Maury Correctional Institution ("Maury") for a psychiatric evaluation.

On April 4, 2008, Plaintiff was sent to Maury for a psychiatric evaluation with psychiatrist Dr. Atelat Philips. Dr. Philips prescribed Paxil for Plaintiff to alleviate his symptoms of depression and aggressive behavior problems.

On or around April 22, 2008, Plaintiff was transferred from Bertie to Warren Correctional Institution ("Warren") in order to receive psychiatric care. On May 9, 2008, Dr. Charles Vance, a psychiatrist at Warren, diagnosed Plaintiff with Depressive Disorder Not Otherwise Specified, Polysubstance Abuse, and Antisocial Personality Disorder. Dr. Vance prescribed Depakote to target Plaintiff's volatility, impulsivity, and poor anger management. On September 17, 2008, Dr. Vance switched Plaintiff's medication from Depakote to Lithium.

From April 2008 to the present, Plaintiff has been receiving psychiatric treatment while in DOC custody. He is currently taking the anti-depression

medication Celexa, the bipolar medication Lithium, and the anti-psychotic medication Loxitane and is experiencing significant relief.

9/27/12 Order at 6 (citing Am. Compl. 3-6.

    iii.    Issues

14

Two issues are before the court, an Eighth Amendment claim for deliberate indifference

to a serious medical condition, and a supplemental state law claim of personal injury as a result

of defendants' negligence.

### iv. Summary Judgment

Summary judgment is appropriate when, after reviewing the record taken as a whole, no

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of

law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party seeking summary

judgment bears the initial burden of demonstrating the absence of a genuine issue of material

fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its

burden, the non-moving party may not rest on the allegations or denials in its pleading.

Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a

genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986) (quotation omitted & emphasis removed). A mere scintilla of evidence supporting the

case is not enough. Anderson, 477 U.S. at 252. The court construes the evidence in the light

most favorable to the non-moving party and draws all reasonable inferences in the non-movant's

favor. Matsushita Elec. Indus. Co., 475 U.S. at 586-587.

### v. Qualified Immunity

Defendants assert qualified immunity. Qualified immunity provides that "government

officials performing discretionary functions generally are shielded from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800,

818 (1982); see Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); Pearson v. Callahan, 555

15

U.S. 223, 231–32 (2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Reichle, 132 S. Ct. at 2093; Messerschmidt v. Millender, 132 S. Ct. 1235, 1244–45 (2012); Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011); Pearson, 555 U.S. at 231–32.

The court must ask two questions to determine whether qualified immunity applies. See, e.g., Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232; Evans v. Chalmers, No. 11-1436, 2012 WL 6554846, at *5 (4th Cir. Dec. 17, 2012); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Unus v. Kane, 565 F.3d 103, 123 n.24 (4th Cir. 2009); Miller v. Prince George's Cnty., 475 F.3d 621, 626–27 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). The court decides which question to address first. Pearson, 555 U.S. at 236; see Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080. The court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. The court also must determine "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. (quotation omitted). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right." al-Kidd, 131 S. Ct. at 2083 (alterations in original) (quotations omitted); see Reichle, 132 S. Ct. at 2093; Anderson v. Creighton, 483 U.S. 635, 640 (1987). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083; see Reichle, 132 S. Ct. at

16

2093. Defendants are entitled to qualified immunity if the answer to either question is "no."
See, e.g., al-Kidd, 131 S. Ct. at 2080; Miller, 475 F.3d at 627; Bostic, 667 F. Supp. 2d at 606.

### vi.  Deliberate Indifference

Plaintiff alleges defendants acted with deliberate indifference to his serious medical
needs. "In order to make out a prima facie case that prison conditions violate the Eighth
Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2)
deliberate indifference to prison conditions on the part of prison officials.'" Strickler v. Waters,
989 F.2d 1375, 1379 (4th Cir. 1993) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The
Supreme Court has explained that the first prong is an objective one–the prisoner must show that
"the deprivation of [a] basic human need was objectively 'sufficiently serious'"–and the second
prong is subjective–the prisoner must show that "subjectively 'the officials act[ed] with a
sufficiently culpable state of mind.'" See Strickler, 989 F.2d at 1379 (quotations omitted).

The court begins with the objective prong of the Eighth Amendment test. "[F]or prison
conditions to rise to the level of unconstitutional punishment, there must be [objective] evidence
of a serious medical and emotional deterioration attributable to the challenged condition."
Strickler, 989 F.2d at 1380.  Relying on Estelle v. Gamble, 429 U.S. 97, 104 (1976), the Fourth
Circuit has applied the standard of "deliberate indifference" to serious psychological conditions
of prisoners. Gordon v. Kidd, 971 F.2d 1087, 1094 (citations omitted). "[S]uicide is a serious
harm," Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006), and "prison officials have a duty to
protect prisoners from self-destruction or self-injury." Lee v. Downs, 641 F.2d 1117, 1121 (4th
Cir.1981). In this case, plaintiff alleges that defendants acted with deliberate indifference
towards his mental health issues, including his suicide attempt. Thus, plaintiff's allegations

17

satisfy the objective prong of the Eighth Amendment test, and the court turns to the subjective prong.

"The key to deliberate indifference in a prison suicide case is whether the defendants knew, or reasonably should have known, of the detainee's suicidal tendencies." Elliott v. Cheshire County, 940 F.2d 7, 10-11 (1st Cir. 1991) (citation omitted). "Deliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). An inmate is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975) (per curiam). Likewise, mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998). Lastly, delay of medical treatment or interference with medical treatment may be sufficient to constitute a violation of the Eighth Amendment. Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009); Webb v. Hamidullah, 281 F. App'x 159, 166 (4th Cir. 2008). Moreover, in order to be liable under section 1983, plaintiffs must show that defendants "acted personally" to deprive plaintiffs of their constitutional rights. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

This case, and the care plaintiff received from Sturz, cannot be considered in a vacuum: the court must examine the totality of the medical care provided in assessing whether defendants were deliberately indifferent to plaintiff's serious medical needs. Smith v. Alvarez, ___

18

F.Supp.2d ___, 2012 WL 4888480 * 7 (N.D. Ill. 2012) (citing Walker v. Peters, 233 F.3d 494, 501 (7th Cir. 2000); Reed v. McBride, 178 F.3d 849, 855 (7th Cir. 1999); Smith v. Hallberg, 2012 WL 4461704, * 8 (N.D. Ill. Sep. 25, 2012). It is clear that plaintiff was struggling with a myriad of problems throughout his period of incarceration, as well as, throughout his lifetime. What is also clear, is that he was continually seen by the mental health care providers at each institution into which he was placed. While in hindsight, it appears that the diligence of his sister in advocating for plaintiff's mental health and in getting him transferred to another facility has stabilized his condition, what is also clear is that deliberate indifference has not been established in this instance.

The records before the court show that the DOC had compiled the medical records for plaintiff, and those records traveled with him from transfer to transfer. What is also evident is that at each institution, mental health providers interviewed plaintiff to determine a proper diagnosis. Due to the history of severe substance abuse, it was difficult for the providers to differentiate between mental illness and substance abuse.

Specifically, the court reviews the facts as they pertain to the claims against Sturz. Sturz was the mental health provider at Bertie in a long line of mental care provided to plaintiff. When plaintiff arrived at Bertie he had been seen by a psychiatrist, Dr. Ridgway, after his first self-harm event within the DOC. Dr. Ridgway had not prescribed psychotropic medication after the September 21, 2006, incident and his transfer to Central Prison for mental evaluation. Plaintiff was transferred away form Central shortly thereafter. Upon transfer, on October 2 and 9, 2006, plaintiff meet with Hoke Staff Psychologist William Favert, who found the diagnosis unchanged. On October 18, 2006, when transferred to Pasquatank, again Dr. Lamielle, found and informed

19

plaintiff his situation did not warrant psychotropic medication. Thereafter, plaintiff was transferred to an MH1 facility. Sturz was the care provider on the receiving end of the transfer.

In an MH1 facility, inmates self refer for mental health treatment. Once plaintiff requested a referral, Sturz met with him in March of 2007. Sturz's diagnosis was in agreement with that of the prior DOC mental health professionals. The treatment method, while unconventional and outside the standard practice of care, simply does not rise to the level of deliberate indifference.

On April 19, 2007, the day that plaintiff stated he was suicidal, immediate action was undertaken. On that day and the days to follow, plaintiff did not become self-injurious. Plaintiff also denied, on the following day, that he in fact had any intention of harming himself. Throughout plaintiff's incarceration he continued to express disappointment about his lack of communication with family. This was a common theme of plaintiff's complaints throughout his incarceration as reflected in the medical notes before the court. Sturz saw plaintiff numerous times after the self-injury incident, and when his mood improved, ordered him off of suicide precautions. Sturz specifically determined that no mental health concerns developed due to this event.

On the morning of the June 8, 2007, self-harm event, which was the sole event at Bertie, plaintiff did not state he was self injurious, but cut himself without knowledge by the guards. On that day, there had been a altercation which guards which upset plaintiff. Again, plaintiff was immediately monitored and cared for, and again, he immediately stated that it was not motivated by a desire to hurt himself, and denied self-harm thoughts. Lastly, Sturz believed the event was

20

feigned and due to behavioral issues rather than a serious mental condition. Thus, Sturz considered the event and determined that the continued course of treatment was proper.

Plaintiff's claims of bipolar disorder were not ignored, but considered and rejected by Sturz. The diagnosis was confused by the history of his sporadic mental health care and serious drug abuse. The prior mental health providers within the DOC had made the same or similar decisions related to plaintiff, and whether or not the decisions were correct appear to be a disagreement among medical professionals. See, eg, Leandry v. County of Los Angeles, 352 Fed. App'x 214, 216 (9th Cir. 2009). The record simply does not show that Sturz subjectively knew that plaintiff was at substantial risk of self-harm or attempted suicide and intentionally disregarded the risk. See Smith v. Atkins, 777 F. Supp. 2d 955, 963-966 (E.D.N.C. 2011). Summary judgment is granted for defendant Sturz on this claim.

As for Hathaway's culpability, the claim also fails. To hold a supervisor liable for a constitutional injury inflicted by a subordinate, a plaintiff must prove three things: "(1) that the supervisor had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response . . . was so inadequate as to show deliberate indifference to or tacit authorization of the [subordinates' conduct]; and (3) that there [is] an affirmative causal link between the supervisor's inaction and the [plaintiff's] constitutional injury . . . ." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (quotations omitted). First, the court need not review the matter having determined that there was no deliberate indifference on the part of Sturz and thus no injury of constitutional magnitude. Secondly, the record indicates that Hathaway had the

21

right to delegate the responsibility to supervise Sturz and oversee prisoner grievances to his designee. The claim fails.

vii.    State Negligence Claims

As for the state law claims, plaintiff's complaint alleging violations of federal constitutional and civil rights law served to vest jurisdiction in this court. However, there exists no independent basis for federal jurisdiction for the state tort claims. This court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(a)(3). Therefore, the court finds that having dismissed the federal constitutional and civil rights claim, any attempt to assert state law claims should likewise be DISMISSED. The dismissal of the state law claims is without prejudice.

Conclusion

Accordingly, defendants' motion to strike is DENIED [D.E.64]. Defendants' motion for summary judgment is GRANTED [D.E. 56] as to the claim for deliberate indifference to a serious medical condition against defendants. The court, therefore, declines to exercise supplemental jurisdiction over the state law claims and they are DISMISSED WITHOUT PREJUDICE. The Clerk is DIRECTED to CLOSE the case.

SO ORDERED, this the $\cancel{2}$ $\cancel{8}$ day of March 2013.

Terrence W. Boyle

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

23